Filing # 66191379 E-Filed 01/05/2018 05:33:49 PM

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, STATE OF FLORIDA
CIVIL DIVISION

THE ESTATE OF SHIRLEY T. COX,
by and through BETTY M. SMITH,
Personal Representative, JOHN E. BALLEW,
by and through JUDITH A. BALLEW,
Attorney-in-Fact, and THE ESTATE OF
ROGER J. LAPP, by and through MARK
F. LAPP, Personal Representative,

      Plaintiffs,                            CLASS REPRESENTATION

vs.                                       CASE NO:

MARCUS & MILLICHAP, INCORPORATED,
and MICHAEL BOKOR,

      Defendants.

_____/

## CLASS ACTION COMPLAINT FOR DAMAGES

Plaintiffs, THE ESTATE OF SHIRLEY T. COX, by and through BETTY M. SMITH,

Personal Representative, JOHN E. BALLEW, by and through JUDITH A. BALLEW, Attorney-

in-Fact, and THE ESTATE OF ROGER J. LAPP, by and through MARK F. LAPP, Personal

Representative, (collectively, the "Plaintiffs") file this Class Action Complaint for Damages

against Defendants, MARCUS & MILLICHAP, INCORPORATED and MICHAEL BOKOR

(herein after, the "Defendants"), and allege as follows:

## NATURE OF THE CLASS ACTION CLAIMS

1.  The claims in this class action arise out of Defendant MARCUS & MILLICHAP, INC.'s

attempts to market and sell twenty-two (22) skilled nursing facilities located throughout the State

1

of Florida (the "Facilities"), with the knowledge that (as described in further detail below) each of the Facilities were and are operating with invalid licenses.

2.    The non-party licensees, operators, managers, consultants, and owners of the Facilities have unlawfully charged the Plaintiffs and similarly situated class members in excess of nine hundred million dollars ($900,000,000.00) for the provision of unlicensed skilled nursing services.

3.    As set forth more fully below, the services for which the non-party licensees, operators, managers, consultants, and owners of the Facilities, and Defendant MICHAEL BOKOR, obtained payments from Plaintiffs and the class members were not lawfully provided because: (a) the subject facilities were not validly licensed as required by Florida law, (b) the non-party licensees, operators, managers, consultants, and owners of the Facilities acted in concert with MICHAEL BOKOR to intentionally circumvent Florida's mandatory licensing requirements, and (c) the non-party licensees, operators, managers, consultants, and owners of the Facilities, in conjunction with MICHAEL BOKOR, used fraud and deception in their efforts to obtain skilled nursing home licenses.

4.    As set forth more fully below, MARCUS & MILLICHAP, INC. and MICHAEL BOKOR, were and are fully aware of the status of the licenses for the Facilities and the actions of the non-party licensees, operators, managers, consultants, and owners of the Facilities. Yet MARCUS & MILLICHAP, INC. endeavored, and upon information and belief is still endeavoring, to market and sell the Facilities to a good faith purchaser for value, as part of a concerted scheme to assist in the divestment of the Facilities by the non-party licensees, operators, managers, consultants, and owners of the Facilities and MARCUS & MILLICHAP, INC.

5.  As a result, Plaintiffs, individually and on behalf of the Class, seek to recover damages from the Defendants for aiding and abetting breach of fiduciary duty, civil conspiracy, and violations of §772.103, Fla. Stat.

## JURISDICTION AND VENUE

1.  This is an action for damages in excess of Fifteen Thousand Dollars ($15,000.00).

2.  On or about December 6, 2016, SHIRLEY COX was admitted to Woodbridge Care Center, a nursing home located at 8720 Jackson Springs, Tampa, Florida 33615, in Hillsborough County, where she remained in primary residence until she was discharged on January 2, 2017.

3.  Plaintiff, BETTY M. SMITH, is the Personal Representative of THE ESTATE OF SHIRLEY T. COX. Letters of Administration, dated July 19, 2017, evidencing BETTY M. SMITH's authority to bring this action on behalf of THE ESTATE OF SHIRLEY T. COX are attached hereto as Exhibit "A."

4.  On or about March 8, 2015, JOHN E. BALLEW was admitted to The Villages Rehabilitation and Nursing Center, a nursing home located at 900 Highway 466, Lady Lake, Florida 32159, in Lake County, where he remained in primary residence until he was discharged on March 19, 2015.

5.  Plaintiff, JUDITH A. BALLEW, is the Attorney-in-Fact of JOHN E. BALLEW. A Durable Power of Attorney evidencing JUDITH A. BALLEW's authority to bring this action on JOHN E. BALLEW's behalf is attached hereto as Exhibit "B".

6.  On or about May 30, 2016, ROGER J. LAPP was admitted to Citrus Health and Rehabilitation Center, a nursing home located at 701 Medical Court East, Inverness, Florida 34452, in Citrus County, where he remained in primary residence until June 4, 2016. ROGER

3

J. LAPP was re-admitted on June 6, 2016, and remained at Citrus Health and Rehabilitation Center until June 30, 2016. ROGER J. LAPP was re-admitted to Citrus Health and Rehabilitation Center on July 18, 2016, where he remained in primary residence until August 16, 2016.

7.     Plaintiff, MARK F. LAPP, is the Personal Representatives of THE ESTATE OF ROGER J. LAPP, pursuant to Letters of Administration, dated March 3, 2017, which are attached hereto as Exhibit "C".

8.     Defendant, MARCUS & MILLICHAP, INC., is a Delaware corporation with its principal place of business at 23975 Park Sorrento, Suite 400, Calabasas, California 91302.

9.     Defendant MARCUS & MILLICHAP, INC. maintains five offices in the State of Florida, including an office at 4030 W. Boy Scout Boulevard, Suite 850, Tampa, Florida 33607, in Hillsborough County.

10.     Defendant MARCUS & MILLICHAP, INC. conducted and engaged in business in the State of Florida. Accordingly, pursuant to Florida Statute §48.193(1)(a)(1), Defendant MARCUS & MILLICHAP, INC. is subject to the jurisdiction of the courts of the State of Florida.

11.     Defendant MARCUS & MILLICHAP, INC. committed tortious acts against Plaintiffs and the Class members in the State of Florida. Each tortious act is specifically alleged in the subsequent counts, which include violations of Florida Statutes §§ 772.101, *et seq.*, and the common law. Accordingly, pursuant to Florida Statute §48.193(1)(a)(2), Defendant MARCUS & MILLICHAP, INC. is subject to the jurisdiction of the courts of the State of Florida.

4

12.     Defendant, MICHAEL BOKOR, is an individual resident and citizen of the State of Florida who is conducting business in the State of Florida. Accordingly, pursuant to Florida Statute §48.193(1)(a)(1), Defendant is subject to the jurisdiction of the courts of the State of Florida.

13.     MICHAEL BOKOR committed tortious acts against Plaintiffs and the Class members in the State of Florida.  Each tortious act is specifically alleged in the subsequent counts, which include violations of Florida Statutes §§ 772.101, *et seq.*, and the common law. Accordingly, pursuant to Florida Statute §48.193(1)(a)(2), MICHAEL BOKOR is subject to the jurisdiction of the courts of the State of Florida.

14.     Venue is proper in Hillsborough County, Florida.

## CLASS ACTION ALLEGATIONS

15.     Plaintiffs, THE ESTATE OF SHIRLEY T. COX, by and through BETTY M. SMITH, Personal Representative, JOHN E. BALLEW, by and through JUDITH A. BALLEW, Attorney-in-Fact, and THE ESTATE OF ROGER J. LAPP, by and through MARK F. LAPP, Personal Representative, bring this action pursuant to Rule 1.220(a) and 1.220(b)(1) and/or (3) of the Florida Rules of Civil Procedure, individually and on behalf of a class of persons (herein after, the "Class") who resided in any of the Facilities at any time during the period January 5, 2014 through the date of this Complaint.

16.     The Class is so numerous that separate joinder of each member is impracticable and contrary to the public good. Plaintiffs are unsure of the number of persons in the Class, but believe that the number will exceed three thousand (3,000). The members of the Class and/or their guardians and representatives are geographically dispersed throughout the State of Florida and possibly other states.

5

17.     The claims of the Plaintiffs, SHIRLEY T. COX, JOHN E. BALLEW, and ROGER J. LAPP, raise questions of law and fact common to the questions of law and fact raised by each member of the Class, as detailed more fully below.

18.     There are questions of law and fact which are common to the Class and which predominate over questions affecting the individual members. In fact, virtually all questions of fact are common to the representative parties and to the Class. Questions of law are virtually identical for the representative parties and each member of the Class. Common questions of law and fact thus predominate over any question of law or fact affecting only individual members of the Class.

19.     There are numerous questions of fact that are common to each claim. Such questions of fact include:

   a.  The care and services to which the Class members were entitled under applicable law;

   b.  The care and services actually provided at the Facilities;

   c.  Whether the licenses for the Facilities were procured through fraudulent misrepresentations;

   d.  Whether the misrepresentations contained in the licensure applications for each of the Facilities were knowing and intentional;

   e.  Whether the licensees and management companies of the Facilities breached their respective fiduciary duties to the Class members in operating the Facilities with invalid licenses;

6

    f.   Whether the licensees and management companies of the Facilities breached their fiduciary duties to the Class members in holding the Facilities out as validly licensed skilled nursing facilities;

    g.   Whether the licensees and management companies of the Facilities breached their fiduciary duties to the Class members in charging and collecting money from the Class members in exchange for the provision of unlicensed services at the Facilities;

    h.   Whether the Defendants knew or should have known of the multiple breaches of fiduciary duties by the licensees and management companies of the Facilities owed to the Class members;

    i.   Whether the Defendants encouraged or  substantially assisted the licensees and management companies of the Facilities in breaching their fiduciary duties owed to the Class members;

    j.   Facts supporting denials and affirmative defenses of the Defendant.

20.    There are also numerous questions of law that are common to each claim. Such questions of law include:

    a.   The existence of a fiduciary relationship between the licensees and management companies of the Facilities and the Class members;

    b.   The legal effect of the fiduciary relationship on the duties of the licensees and management companies of the Facilities;

    c.   The liability of Defendant MARCUS & MILLICHAP, INC. for knowingly marketing the Facilities in a false manner by claiming each was a validly licensed skilled nursing facility;

7

d.   The liability of Defendant MICHAEL BOKOR for knowingly preparing, signing, and filing with the State of Florida materially false license applications for the Facilities;

e.   The liability of the Defendant MARCUS & MILLICHAP, INC. for generating the false marketing brochure described herein;

f.   The liability of the Defendant MARCUS & MILLICHAP, INC. for circulating the false marketing brochure described herein;

g.   The liability of the Defendant MARCUS & MILLICHAP, INC. for concealing its knowledge of the breaches of fiduciary duty by the licensees and management companies for the Facilities owed to the Class members;

h.   The liability of the Defendant MICHAEL BOKOR for concealing his knowledge of the breaches of fiduciary duty by the licensees and management companies for the Facilities owed to the Class members;

i.   The liability of the Defendants for agreeing to participate in the schemes described herein;

j.   The elements of a cause of action for aiding and abetting breach of fiduciary duty;

k.   The measure of damages in an aiding and abetting breach of fiduciary duty action;

l.   The elements of a cause of action for civil conspiracy;

m.   The measure of damages in a civil conspiracy action;

n.   The elements for a cause of action for violations of §772.103(4), Fla. Stat.

o.   The measure of damages in an action for violations of §772.103(4), Fla. Stat.

21.     The claims of the Plaintiffs are typical of the claims possessed and capable of being asserted by each member of the Class. Specifically, Plaintiffs and each member of the Class or

their guardian or personal representative have entered into a contract with the Facilities which required payment by the resident for certain care, services, and supplies; Plaintiffs and each Class member has paid for or had payment made by Medicaid and/or Medicare on their behalf for services, care and supplies. Further, the relationship between Plaintiffs and each Class member and the licensees and management companies of the Facilities placed Plaintiffs and each Class member in a position in which they placed their trust, confidence, health, and safety (indeed their very lives) into the hands of the licensees and management companies, creating a fiduciary relationship. The licensees and management companies have breached their fiduciary duties toward the Plaintiffs and the Class members, by failing to provide licensed care as required for the health and wellbeing of Plaintiffs and the Class members, by misrepresenting to the Plaintiffs and the Class members that the Facilities were and are validly licensed, and by concealing the management companies for the Facilities to shield them from liability to the Plaintiffs and Class members. Defendants have aided and abetted these breaches of fiduciary duties to the Plaintiffs and the Class members, and have also conspired with other non-parties against the Plaintiffs and the Class members to sell the Facilities and their assets to a good faith purchaser for value in an effort to extinguish the liability of all involved to the Plaintiffs and the Class members.

22.     Plaintiff SHIRLEY T. COX has claims typical to and facts and legal issues common to members of the Class in that SHIRLEY T. COX was a resident of Woodbridge Care Center from December 6, 2016 through January 2, 2017.

23.     As detailed below, Defendants aided and abetted the breaches of fiduciary duties by the licensee and the management company for Woodbridge Care Center to Plaintiff SHIRLEY T. COX.

9

24.     As detailed below, Defendants conspired against Plaintiff SHIRLEY T. COX.

25.     Plaintiff JOHN E. BALLEW has claims typical to, and facts and legal issues common to, members of the Class in that JOHN E. BALLEW was a resident of The Villages Rehabilitation and Nursing Center from March 8, 2015 through March 19, 2015.

26.     As detailed below, Defendants aided and abetted the breaches of fiduciary duties by the licensee and the management company for The Villages Rehabilitation and Nursing Center to Plaintiff JOHN E. BALLEW.

27.     As detailed below, Defendants conspired against Plaintiff JOHN E. BALLEW.

28.     Plaintiff ROGER J. LAPP has claims typical to and facts and legal issues common to members of the Class in that ROGER J. LAPP was a resident of Citrus Health and Rehabilitation Center from May 30, 2016 through June 4, 2016, June 6, 2016 through June 30, 2016, and July 18, 2016 through August 16, 2016.

29.     As detailed below, Defendants aided and abetted the breaches of fiduciary duties by the licensee and the management company for The Villages Rehabilitation and Nursing Center to Plaintiff ROGER J. LAPP.

30.     As detailed below, Defendants conspired against Plaintiff ROGER J. LAPP.

31.     Plaintiffs understand the nature of a class action and agree to be bound by the method chosen by the Court or jury to allocate damages for the claims in the Complaint and agree to be bound by the verdict of a jury on all issues triable by jury.

32.     Plaintiffs are committed to prosecuting this action and have retained the undersigned attorneys who are experienced in complex litigation and have particular experience and expertise in nursing home litigation. As a result of prior litigation, the attorneys have gathered significant information and evidence about nursing homes owned and managed by the

10

common enterprise detailed herein. The offices of Wilkes and McHugh, P. A. are structured and staffed to resolve complex legal issues, evaluate the care and services provided at the Facilities, and to investigate the actions of Defendants in a thorough and efficient manner.

33.     A class action is superior to any other available method for the fair and efficient adjudication of this controversy. It would be impracticable and inefficient to adjudicate these actions independently, and the potential recovery would not justify the expense of litigation. Separate adjudication of the same facts and law in separate courts with at least three thousand (3,000) separate juries would create a waste of resources and economy for the courts, the Defendants, the Plaintiffs, the juries, and the public. Many of the residents at the facilities listed herein lack the ability and the resources to pursue individual actions against the Defendants. Separate adjudication also would create the risk of inconsistent judgments. Thus, class representation is superior to other available methods for the fair and efficient adjudication of the controversy.

34.     The prosecution of separate claims by the individual class members would also create the risk of adjudications concerning the individual members thereof, which as a practical matter, would be dispositive of the interests of other members of the Class who are not parties to the adjudications, or substantially impair or impede the ability of those other members thereof who are not parties to the adjudications to protect their interests.

35.     The members of the Class can easily be identified and located from the records of the Facilities listed herein. Thus, notice to all members of the Class may be easily and efficiently accomplished at the time and manner established by the Court.

36.     Plaintiffs have engaged the professional services of the undersigned attorneys to initiate and prosecute this action. Pursuant to authoritative case law, the litigation expenses of

11

such Plaintiffs' counsel and Class counsel's attorneys' should be paid from the common fund generated in this cause, if any, from amounts awarded pursuant to state statutory law, or otherwise, with such fees being subject to Court approval. The payment of such fees and reimbursement of litigation expenses is, therefore, contingent on the outcome of the litigation.

37.     It would be impracticable and undesirable for the members of the Class to bring separate actions as adjudication of at least three thousand (3,000) different plaintiffs and it would create a risk that different juries would come to very different conclusions regarding the conduct of the Defendants. Thus the prosecution of separate claims by individual members of the Class would create risk of inconsistent or varying adjudications concerning individual members of the Class which could establish incompatible standards of conduct for the Defendants. Indeed, there is no meaningful option to Plaintiffs other than bringing these claims pursuant to a class action.

## COMMON FACTS

38.     Defendant MARCUS & MILLICHAP, INC. is a highly sophisticated real estate and business broker with an entire division dedicated to seniors housing investment properties.

39.     Seniors housing, and more specifically nursing homes, are a highly regulated industry at both the Federal and State levels.

40.     MARCUS & MILLICHAP, INC. has a substantial amount of experience in the seniors housing industry as a result of its nationwide presence and its involvement in closing numerous sales of substantial seniors housing assets.

41.     In fact, MARCUS & MILLICHAP, INC.'s Institutional Property Advisors division in 2015 closed 64 seniors housing transactions with a sales volume of approximately $790

12

Million. In 2016, the same division of MARCUS & MILLICHAP, INC. completed well over $1 Billion in closed transactions of seniors housing assets.

42.     According to MARCUS & MILLICHAP, INC.'s own promotional materials, MARCUS & MILLICHAP, INC. has over "40 years of combined seniors housing brokerage experience," has closed over "$4.23 Billion of seniors housing transactions," and has sold "nearly $2 Billion and over 40,000 skilled nursing beds."

43.     Likewise, MICHAEL BOKOR has been working in the seniors housing industry for over a decade. He has worked in different capacities, from senior level management at the Avante Group where he was the Chief Financial Officer, to his (nominal) ownership and operation of multiple nursing home management companies, including Southern SNF Management, Inc. and Reliant Health Care Services, Inc., for which he served as President.

44.     Defendants are therefore highly knowledgeable in all aspects of nursing home operations and compliance, including all the requirements of the Medicare and Florida Medicaid programs.

45.     Defendants are fully aware that all Florida nursing homes, including skilled nursing facilities, must be licensed by the Agency for Health Care Administration ("AHCA") pursuant to Chapters 400, 408, and 409, Florida Statutes.

46.     Specifically, Defendants are aware that the licensure applications submitted to the AHCA must be verified and signed under penalty of perjury attesting to the information contained therein.

47.     Furthermore, Defendants are also aware that each nursing home facility must have a Medicare and Medicaid provider agreement to be able to participate in those programs.

13

48.     The bulk of the income for nursing homes nationwide comes from Federal and State programs such as Medicare and Medicaid. This is true of skilled nursing facilities in Florida as well.

49.     The causes of action asserted in this complaint all arise from the operations and attempted sale of a group of skilled nursing facilities by the Defendants.

50.     The following is a list of the Facilities:

a.     Cypress Care Center f/k/a Brownwood Care Center, which is located at 490 S. Old Wire Rd., Wildwood, Florida.

b.     Citrus Health and Rehabilitation Center, which is located at 701 Medical Court East, Inverness, Florida.

c.     Courtyards of Orlando Rehabilitation and Nursing Center, which is located at 1900 Mercy Drive, Orlando, Florida.

d.     North Campus Rehabilitation and Nursing Center, which is located at 700 N. Palmetto St., Leesburg, Florida.

e.     Parklands Care Center, which is located at 1000 SW 16th Ave., Gainesville, Florida.

f.     South Campus Care Center, which is located at 715 E. Dixie Ave., Leesburg, Florida.

g.     The Villages Rehab & Nursing Center, which is located at 900 Highway 466, Lady Lake, Florida.

h.     Williston Care Center, which is located at 300 NW 1st Ave., Williston, Florida.

14

      i.      Ft. Lauderdale Health and Rehabilitation Center, which is located at 2000 E. Commercial Blvd., Ft. Lauderdale, Florida.

      j.      Glades West Rehabilitation and Nursing Center, which is located at 15955 Bass Creek Road, Miramar, Florida.

      k.      Palms Care Center, which is located at 3370 NW 47th Terrace, Lauderdale Lakes, Florida.

      l.      North Lake Care Center, which is located at 750 Bayberry Drive, Lake Park, Florida.

      m.      Terraces of Lake Worth Care Center, which is located at 1711 6th Ave, Lake Worth, Florida

      n.      Palmetto Care Center, which is located at 6750 W 22nd Ct., Hialeah, Florida.

      o.      Advanced Care Center, which is located at 401 Fairwood Ave., Clearwater, Florida.

      p.      Bayside Care Center, which is located at 811 Jackson St. N, St. Petersburg, Florida.

      q.      Gulf Shore Care Center, which is located at 6767 86th Ave., Pinellas Park, Florida.

      r.      Shore Acres Care Center, which is located at 4500 Indianapolis St. NE, St. Petersburg, Florida.

      s.      Madison Pointe Care Center, which is located at 6020 Indiana Ave., New Port Richey, Florida.

15

t.     Excel Care Center, which is located at 2811 Campus Hill Dr., Tampa, Florida.

u.     Woodbridge Care Center, which is located at 8720 Jackson Springs, Tampa, Florida.

v.     Southern Oaks Care Center, which is located at 600 W. Gregory St., Pensacola, Florida.

51.    According to the applicable statutes and regulations, nursing homes can be independently owned, owned as part of a chain organization, or owned or leased and then managed by a third party.

52.    MARCUS & MILLICHAP, INC. is marketing and selling the Facilities as a managed portfolio, managed by TL Management LLC, a Florida limited liability company with its purported principal place of business at 2071 Flatbush Ave., Suite 22, Brooklyn, N.Y. 11234. The sole owners and managing members of TL Management LLC are Eliezer Scheiner and Teddy Lichtschein.

53.    At all times relevant to this action, the real and personal property comprising each of the Facilities has been owned by either: an entity solely owned by Eliezer Scheiner; an entity solely owned by Teddy Lichtschein; or an entity jointly owned by both Eliezer Scheiner and Teddy Lichtschein (collectively, the "Landowner Entities").

54.    At all times relevant to this action, the principal address for all of the Landowner Entities was 2071 Flatbush Ave., Suite 22, Brooklyn, N.Y. 11234. This address is nothing more than a drop box, similar in size and appearance to a safety deposit box.

55.    At all times relevant to this action, the Landowner Entities have operated as a common enterprise, as evidenced by the common ownership and common principal address.

16

MICHAEL BOKOR along with his companies, Southern SNF Management, Inc. and Reliant Health Care Services, Inc., were vital components of this common enterprise at all material times.

56.      As detailed more fully below, the aim of this common enterprise was to extract as much profit as possible out of the Facilities, at the expense of the health and welfare of the residents, including Plaintiffs and the Class members.

57.      Indeed, as a result of the schemes detailed more fully below, all of the residents at the Facilities during the relevant times were injured by being deceived into suffering substandard levels of care on a daily basis, which placed their health and well-being in jeopardy.

58.      At all times relevant to this action, each of the Facilities was purportedly operated by a licensed Medicaid provider. As Medicaid providers, each licensee was prohibited under Florida law from utilizing any trick, scheme, or device to intentionally mislead a public servant in the performance of his or her official duties.

59.      Furthermore, as a Medicaid provider in the State of Florida, the purported licensee of each of the Facilities was required to abide by all provisions of the Florida Statutes and the Florida Administrative Code which govern Medicaid providers.

60.      This includes Rule 59G-6.010 of the Florida Administrative Code, which provides that reimbursement shall be in accordance with the Florida Title XIX Long-Term Care Reimbursement Plan, Version XLIV, which in turn incorporates by reference the Center for Medicare and Medicaid Services (CMS) Publication 15-1 (CMS-PUB.15-1).

61.      According to Florida Title XIX Long-Term Care Reimbursement Plan, Version XLIV, a Medicaid provider may not be reimbursed for the price of rent if the provider is leasing the facility from a "related organization."

17

62.     Florida Title XIX Long-Term Care Reimbursement Plan, Version XLIV, defines "related" as "the provider to a significant extent is...controlled by the organization furnishing the...facilities."

63.     Florida Title XIX Long-Term Care Reimbursement Plan, Version XLIV, states "control exists where an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization."

64.     All of the Facilities are leased by the respective licensee.

65.     For most of the Facilities, the common enterprise utilized a master lease structure whereby all the facilities involved were bundled together under a master lease and required to make a single rent payment jointly. The source of the collective lease payment was the monies received from nursing home residents which were pooled and commingled by the enterprise.

66.     At all times relevant to this action, all of the Landowner Entities were "related organizations" with regard to the purported licensees of each of the Facilities because each purported licensee "to a significant extent" was "controlled" by the Landowner Entities.

67.     This is true because the Landowner Entities exerted "control" over the purported licensees of the Facilities as they had the power to significantly direct the actions of the purported licensees through operation of *inter alia* the lease agreements for the Facilities.

68.     The common provisions of the leases which demonstrate this control:

a.  Limit to a substantial extent the ability of Tenant to sell, assign, sublet, or transfer in any way any of its interests in the lease, in the premises, or **in the Tenant entity itself**, without Landlord's prior consent;

b.  Confirm that Landlord is the true owner and holder of the certificate of need and the owner of all certificate of need rights, and not the Tenant; and

18

    c.   Establish that upon termination or cancellation of the lease, all rights to operate the facility, **including the licenses**, certifications, and certificates of need automatically vest in the Landlord or its designee.

69.    At all times relevant to this action, none of the Landowner Entities has ever received, or even applied for, a license to operate a skilled nursing facility from the State of Florida. Yet the leases make it clear that, in reality, the purported licensees are not only leasing the Facilities but also the licenses from the Landowner Entities.

70.    Due to the nature of the Landowner Entities as "related organizations," none of the purported licensees of the Facilities are legally allowed under Florida law to claim a reimbursement for rent costs.

71.    Yet every purported licensee has routinely billed the Florida Medicaid program for rents at all times relevant to this action. Moreover, the Landowner Entities have charged the purported licensees exorbitant amounts to rent the Facilities.

72.    The licensee entity for each of the Facilities was formed for the specific purpose of appearing unrelated to the Landowner Entities, and to appear to hold the licenses for the sake of the AHCA. At the same time, the provisions of the leases maintained the status of the Landowner Entities as the true license owner and holder.

73.    Furthermore, the licensee entities were formed as undercapitalized "shells" with inadequate insurance for the specific purpose of limiting the potential liability of the purported licensees to future creditors, including Plaintiffs and the Class members.

74.    The intent of the common enterprise when creating this corporate structure was to ensure that liability and punishment for wrongdoing would flow to under-capitalized shells, while the bounty of their facility operations would be safely hidden away.

19

75.     This corporate structure utilized by the common enterprise equates to a trick, scheme, and device utilized to intentionally mislead the AHCA's officials in the performance of their official duties.

76.     At all times material, MICHAEL BOKOR, Mr. Scheiner, and Mr. Lichtschein, as part of their modus operandi for the common enterprise, have utilized tricks, schemes, and devices to intentionally mislead officials at the AHCA as a matter of course.

77.     The following is just one example of the tricks, schemes, and devices utilized by the common enterprise to mislead the officials at the AHCA:

    d.  On November 18, 2014, Mr. Scheiner and Mr. Lichtschein, with the assistance of Reliant Health Care Services, Inc. and MICHAEL BOKOR, submitted a Certificate of Need (herein after "CON") application to the ACHA in the name of a "shell" entity: CON App Marion, LLC.

    e.  Florida law requires CON applicants to disclose their history of operating other nursing facilities including *inter alia* whether the applicant has ever had a nursing facility license denied, revoked, or suspended and whether the applicant has had a nursing facility placed into receivership.

    f.  MICHAEL BOKOR, Mr. Scheiner, and Mr. Lichtschein, as part of the modus operandi for the common enterprise, evaded these reporting requirements by utilizing a trick, scheme, and device whereby the "shell" entity, CON App Marion, LLC, claimed since CON App Marion, LLC was "created to sponsor the application" and therefore "this [reporting requirement] does not apply."

    g.  Mr. Scheiner and Mr. Lichtschein, as owners of numerous nursing facilities in numerous states, are subject to these reporting requirements in the CON

application. By creating a "shell" entity for the sole purpose of applying for the CON, MICHAEL BOKOR, Mr. Scheiner, and Mr. Lichtschein attempted to mask their identity to trick and mislead the AHCA officials in the performance of their official duties of reviewing the CON application.

78.     As each purported licensee was in reality a "shell," each of the Facilities necessarily had to be operated by a management company.

79.     At all times material, all of the Facilities have been operated by a management company, either Southern SNF Management Inc., TL Management LLC, or Reliant Health Care Services Inc. (the "Management Companies"), which company also managed the property comprising each of the Facilities.

80.     Yet, at all relevant times, none of the Facilities ever disclosed its respective management company to the AHCA, as required by Florida law.

81.     In fact, each of the licensees of all the Facilities has affirmatively concealed its respective management company from the AHCA as part of a trick, scheme, and device utilized for the purpose of shielding the Management Companies from liability to future creditors, including Plaintiffs and the Class members, and for the purpose of misleading officials at the AHCA in the performance of their official duties regarding licensing and reimbursement, among other things.

82.     Additionally, the state licensure applications which affirmatively concealed the Management Companies were routinely prepared and signed under penalty of perjury by employees of the Management Companies, including MICHAEL BOKOR himself.

83.     The following is just one specific example related to Woodbridge Care Center, where SHIRLEY T. COX resided at relevant times:

21

a.  During SHIRLEY T. COX's residency at Woodbridge Care Center, Reliant Health Care Services, Inc. operated and managed Woodbridge Care Center.

b.  Prior to SHIRLEY T. COX's residency at Woodbridge Care Center, Southern SNF Management, Inc. operated and managed Woodbridge Care Center.

c.  Southern SNF Management, Inc. was and is a management company owned and operated as part of the common enterprise detailed herein, which at all times was nominally owned and controlled by MICHAEL BOKOR, and which was the predecessor-in-interest to Reliant Health Care Services, Inc. MICHAEL BOKOR is the President of Reliant Health Care Services, Inc. and was the President of Southern SNF Management, Inc. Over a decade ago he was the Chief Financial Officer of a nursing home company named the Avante Group, which was owned by Teddy Lichtschein.

d.  At all relevant times, Woodbridge Facility, Inc., the licensee of Woodbridge Care Center, never disclosed to the AHCA that Reliant Health Care Services, Inc. or Southern SNF Management, Inc. was its manager.

e.  The application for licensure for Woodbridge Care Center filed in or around 2009 was signed under penalty of perjury by **MICHAEL BOKOR** as an "Authorized Representative" of the applicant. This application, which was signed by the nominal owner of a **management company**, affirmatively stated that Woodbridge Care Center was **not** managed by an entity other than the licensee.

f.  Similarly, the application for licensure for Woodbridge Care Center filed in or around 2011 was signed under penalty of perjury by **MICHAEL BOKOR** as an "Authorized Representative" of the applicant. This application, which again was

22

signed by the nominal owner of a **management company**, affirmatively stated that Woodbridge Care Center was **not** managed by an entity other than the licensee.

g.  Additionally, the contact person for the 2011 license application for Woodbridge Care Center was Tova Sapirman, who listed her email as "tova.sapirman@**southernsnf.com**."

h.  Similarly, the application for licensure for Woodbridge Care Center filed in or around 2013 was signed under penalty of perjury by **MICHAEL BOKOR** as an "Authorized Representative" of the applicant. This application, which again was signed by the nominal owner of a **management company**, affirmatively stated that Woodbridge Care Center was **not** managed by an entity other than the licensee.

i.  Additionally, the contact person for the 2013 license application for Woodbridge Care Center was Hannah Schneck, an employee at the time of Southern SNF Management, Inc. who now works for Reliant Health Care Services, Inc. and who listed her email as "hanna.schneck@**southernsnf.com**."

j.  Lastly, the application for licensure for Woodbridge Care Center filed in or around 2015 listed the contact person as Hannah Schneck, by then an employee of Reliant Health Care Services, Inc. who listed her email as "hanna.schneck@**relianthcs.com**." Just as in the other applications listed above, the application affirmatively stated that Woodbridge Care Center was **not** managed by an entity other than the licensee.

k.  Upon information and belief, Reliant Health Care Services, Inc. and MICHAEL BOKOR affirmatively concealed themselves from AHCA to avoid disclosing that

23

Reliant Health Care Services, Inc. is and was a "related organization" to Woodbridge Facility, Inc.

84.     These misrepresentations concerning the Management Companies for the Facilities were thus knowing and intentional, as well as an integral part of the modus operandi of the common enterprise.

85.     As a result of these intentional misrepresentations to the AHCA, the license for each of the Facilities was, and is, void *ab intitio* under Florida law.

86.     Therefore, all services provided at the Facilities were unlicensed at all times, and the Facilities had no legal right whatsoever to collect payments from residents, including Plaintiffs, or reimbursements from Medicaid and Medicare. All money received by the Facilities for the provision of skilled nursing services is therefore the proceeds of unlawful activity. Also, the Facilities' assets therefore do not include valid skilled nursing facility licenses.

87.     Upon information and belief, these proceeds of unlawful activity were routinely pooled, commingled, and funneled throughout the common enterprise to entities and individuals, including MICHAEL BOKOR, Eliezer Scheiner, and Teddy Lichtschein.

88.     As a result of the bundling of the leases and the concealment of the Management Companies, the common enterprise was able to substantially profit from the operations of nursing homes as the landlords, licensees, and managers, without ever exposing itself to any liability for the operations of the Facilities.

89.     Upon information and belief, the common enterprise received a revolving line of credit to provide working capital for all of its nursing homes. Upon further information and

24

belief, this line of credit was secured by the monies received from nursing home residents which were pooled and commingled by the managing entities within the enterprise.

90.     Further, upon information and belief, the common enterprise enjoyed the benefits and assumed the debts from this revolving line of credit jointly and severally; utilizing this line of credit to pay all expenses of the enterprise entities and also using the collectively pooled nursing home revenue to pay down debt of the enterprise as a whole.

91.     Based on this structure, as well as the bundled master lease structure described above, the more profitable enterprise entities covered the debts of the less profitable entities, resulting in a de facto sharing of the profits and losses of the jointly operated common enterprise.

92.     MARCUS & MILLICHAP, INC. has maintained an on-going relationship with Mr. Scheiner, Mr. Lichtschein, and the common enterprise for at least five (5) years. MARCUS & MILLICHAP, INC. has specifically brokered numerous seniors housing assets for which Mr. Scheiner and Mr. Lichtschein lodged bids, leading MARCUS & MILLICHAP, INC. to ostensibly perform due diligence on the common enterprise multiple times. This due diligence, upon information and belief, included investigations into the assets of the facilities already owned and operated by the common enterprise, Mr. Scheiner, and Mr. Lichtschein, the most important of which is the license to operate. As a result of the repeated occasions for due diligence investigations into the background and operations of the common enterprise, Mr. Scheiner, and Mr. Lichtschein, MARCUS & MILLICHAP, INC. became intimately aware of the specific corporate structures, schemes, tricks, artifices, devices, and methods of operating utilized by MICHAEL BOKOR, Mr. Scheiner, and Mr. Lichtschein in the operations of the common enterprise.

93.     Defendants were and are aware that each of the Landowner Entities, and TL Management LLC, list their principal place of business as a drop box at 2071 Flatbush Ave., Suite 22, Brooklyn, N.Y. 11234, and that they operate as a common enterprise.

94.     Defendants also were and are aware of the status of the Management Companies as the management companies which operated the Facilities and managed the properties, notwithstanding the representations by each purported licensee that each was not managed at any relevant time.

95.     Therefore, Defendants were and are aware that the licenses for each of the Facilities are void, and that the Facilities have been unjustly enriched by collecting fees in exchange for the provision of unlicensed services. Defendants were further aware of the common enterprise and the methods employed by it to defraud residents, Plaintiffs, Class members, and the State of Florida.

96.     Furthermore, Defendants were and are aware of the tricks, schemes, and devices utilized by the common enterprise to mislead the AHCA's officials in the performance of their official duties.

97.     Notwithstanding its knowledge of the common enterprise, the enterprise's modus operandi, and the status of the licenses for the Facilities, MARCUS & MILLICHAP, INC. agreed to market and sell the Facilities as a managed portfolio, described by MARCUS & MILLICHAP, INC. as the "TL Management Florida Portfolio."

98.     At some time in or around early 2015, pursuant to this agreement with the common enterprise, MARCUS & MILLICHAP, INC. caused a brochure (the "Brochure") to be created as an advertisement for the sale of the Facilities and the Facilities' assets.

99.     In the Brochure, MARCUS & MILLICHAP, INC. represented *inter alia*:

26

a. "IPA will perform **detailed due diligence** and financial analysis on each asset";

b. "IPA has extensive knowledge in structuring transactions in unique, creative ways to optimize shareholder value";

c. "Our team has a keen sense of how to deconstruct financial statements for a particular, non-performing asset, reconstruct it using market and comparable data, position it properly so it is **attractive to bidders**, and **tell the back story to bidders in a credible way**"; and

d. "TL Management's Florida portfolio is located in highly sought after neighborhoods and are **premium assets**."

100. Defendants are vital contributors to the complex tricks and schemes perpetrated by the common enterprise consisting of the Landowner Entities, the purported licensees, the Management Companies, and their common principals and beneficial owners.

101. Without the assistance and expertise of MARCUS & MILLICHAP, INC., it would be virtually impossible for the Landowner Entities to sell off ("fence") the Facilities to unsuspecting purchasers for value thereby cutting off future creditors', including Plaintiffs', ability to recover against the common enterprise.

102. Without the assistance and expertise of MICHAEL BOKOR, the common enterprise could never have operated in the way described above, nor could it have profited from inter-related company fees to the extent it has.

103. Defendants, at all relevant times, were aware of the importance of the role they each played to the success of the tricks and schemes perpetrated by the common enterprise, and yet were and are willing participants in them.

27

104.     As a direct and proximate result of the Defendants' actions, Plaintiffs have been required to obtain the undersigned counsel.

105.     All prerequisites to instituting the instant action have been satisfied or waived.

**Count I**
**<u>Aiding and Abetting Breach of Fiduciary Duties</u>**
**MARCUS & MILLICHAP, INC.**

106.     Plaintiffs re-allege paragraphs 1 through 105 above, as if fully set forth herein.

107.     At all relevant times, the licensees of the Facilities owed express and implied fiduciary duties to all of the residents at the Facilities including Plaintiffs and the Class members, pursuant to Florida law.

108.     Furthermore, as the true operators and property managers of the Facilities, the Management Companies each also owed express fiduciary duties to all the respective residents, including Plaintiffs, under Florida law.

109.     The Management Companies and the purported licensees of the Facilities, at all times, breached their fiduciary duties to all the residents of the Facilities by *inter alia*:

    a.  Operating unlawfully without a valid license from the State of Florida;

    b.  Concealing the management companies from the AHCA and the public; and

    c.  Perpetrating the rent reimbursement scheme to benefit the common enterprise, at the expense of the residents of the Facilities, including Plaintiffs and the Class members.

110.     MARCUS & MILLICHAP, INC. had knowledge, based on its extensive experience in the seniors housing market, of Plaintiffs' fiduciary relationship with the Management Companies and the purported licensees of the Facilities by virtue of their status as residents in the Facilities.

28

111.    Moreover, MARCUS & MILLICHAP, INC. knew or should have known that the Facilities were operating with void licenses; the Facilities were concealing the Management Companies from the AHCA; and the purpose of the concealment was to defraud Plaintiffs, Class members, other creditors, and the State of Florida.

112.    MARCUS & MILLICHAP, INC. substantially assisted and encouraged the Management Companies and the purported licensees in breaching their fiduciary duties to Plaintiffs by advertising and attempting to sell the Facilities; causing the Brochure to be created; representing that the Facilities were and are "premium assets"; representing that MARCUS & MILLICHAP, INC. would perform "detailed due diligence and financial analysis" on the Facilities; agreeing to manipulate underperforming assets to make them more attractive to prospective purchasers for value; and further concealing the void nature of the licenses for the Facilities.

113.    MARCUS & MILLICHAP, INC. knew or should have known that its actions in substantially assisting the Management Companies and the purported licensees in breaching their fiduciary duties would cause harm to the Plaintiffs.

114.    As a direct and proximate result of the acts of MARCUS & MILLICHAP, INC., Plaintiffs suffered damages.

WHEREFORE, Plaintiffs and the Class members demand judgment against MARCUS & MILLICHAP, INC. for damages, costs, expenses, and reasonable attorneys' fees, and all other amounts to which Plaintiffs and the Class members may be entitled.

### Count II
### Aiding and Abetting Breach of Fiduciary Duties
### MICHAEL BOKOR

115.    Plaintiffs re-allege paragraphs 1 through 105 above, as if fully set forth herein.

116. At all relevant times, the licensees of the Facilities owed express and implied fiduciary duties to all of the residents at the Facilities including Plaintiffs, pursuant to Florida law.

117. Furthermore, as the true operators and property managers of the Facilities, the Management Companies each also owed express fiduciary duties to all the respective residents, including Plaintiffs and the Class members, under Florida law.

118. The Management Companies and the purported licensees of the Facilities, at all times, breached their fiduciary duties to all the residents of the Facilities by *inter alia*:

   d. Operating unlawfully without a valid license from the State of Florida;

   e. Concealing the management companies from the AHCA and the public; and

   f. Perpetrating the rent reimbursement scheme to benefit the common enterprise, at the expense of the residents of the Facilities, including Plaintiffs and the Class members.

119. MICHAEL BOKOR had knowledge, based on his extensive experience in the seniors housing industry and the common enterprise, of Plaintiffs' fiduciary relationship with the Management Companies and the purported licensees of the Facilities by virtue of their status as residents in the Facilities.

120. Moreover, MICHAEL BOKOR knew or should have known that the Facilities were operating with void licenses; the Facilities were concealing the Management Companies from the AHCA; and the purpose of the concealment was to defraud Plaintiffs, Class members, other creditors, and the State of Florida.

121. MICHAEL BOKOR substantially assisted and encouraged the Management Companies and the purported licensees in breaching their fiduciary duties to Plaintiffs by

preparing numerous materially false licensure applications for the licenses to operate the Facilities; signing under penalty of perjury numerous materially false licensure applications for the licenses to operate the Facilities; filing numerous materially false licensure applications for the licenses to operate the Facilities; concealing Southern SNF Management, Inc. from the AHCA and the residents at the Facilities; concealing Reliant Health Care Services, Inc. from the AHCA and the residents at the Facilities.

122.    MICHAEL BOKOR knew or should have known that its actions in substantially assisting the Management Companies and the purported licensees in breaching their fiduciary duties would cause harm to the Plaintiffs.

123.    As a direct and proximate result of the acts of MICHAEL BOKOR, Plaintiffs suffered damages.

WHEREFORE, Plaintiffs and the Class members demand judgment against MICHAEL BOKOR for damages, costs, expenses, and reasonable attorneys' fees, and all other amounts to which Plaintiffs and the Class members may be entitled.

### Count III
### <u>Civil Conspiracy</u>
### MARCUS & MILLICHAP, INC. and MICHAEL BOKOR

124.    Plaintiffs re-allege paragraphs 1 through 105 above, as if fully set forth herein.

125.    At some time, MARCUS & MILLICHAP, INC. executed an agreement with the common enterprise, including MICHAEL BOKOR, to market, advertise, and sell the Facilities as if they had valid licenses using misrepresentations and false advertisements.

126.    Pursuant to this agreement, MARCUS & MILLICHAP, INC. committed overt acts in furtherance of the agreement, including but not limited to:

a.  Causing the Brochure to be created;

31

    b.   Representing that MARCUS & MILLICHAP, INC. could manipulate the financials of the Facilities in a way to make them appear to be high-performing assets;

    c.   Representing that MARCUS & MILLICHAP, INC. would conduct "detailed due diligence" on the Facilities in the Brochure; and

    d.   Representing that the Facilities were and are "premium assets."

127.    Pursuant to this agreement, MICHAEL BOKOR committed overt acts in furtherance of the agreement, including but not limited to:

    a.   Continuing to conceal the Management Companies from the residents and the State of Florida;

    b.   Preparing, signing, and filing numerous additional false licensure applications for the licenses to operate the Facilities;

    c.   Providing unlicensed care and services at the Facilities through his management companies; and

    d.   Collecting inflated and impermissible "related organization" fees from the Facilities through his management companies.

128.    On information and belief, should MARCUS & MILLICHAP, INC. successfully sell the Facilities, Plaintiffs will not be able to recover damages or restitution owed to them by the purported licensees of the Facilities, the Management Companies, or the Landowner Entities.

129.    Upon further information and belief, extinguishing the rights of the Plaintiffs and the Class members as described in the preceding paragraph is exactly what Defendants and the common enterprise intended, and still intend, to be the result of the conspiracy.

32

130.     At all relevant times, Defendants knew or should have known that their actions described in this count would directly and proximately harm the Plaintiffs and the Class members.

131.     Defendants are jointly and severally liable for all the acts committed by their co-conspirators in furtherance of the conspiracy.

132.     As a direct and proximate result of this conspiracy, Plaintiffs and the Class members suffered damages.

WHEREFORE, Plaintiffs and the Class members demand judgment against the Defendants for damages, restitution, costs, expenses, and reasonable attorneys' fees, and all other amounts to which Plaintiffs and the Class members may be entitled.

### Count IV
### Civil Remedies for Criminal Practices
### MARCUS & MILLICHAP, INC.

133.     Plaintiffs re-allege paragraphs 1 through 105 above, as if fully set forth herein.

134.     MARCUS & MILLICHAP, INC., by and through its agents, employees, and third party contractors, conducted and participated in the enterprise of providing brokerage services for real estate and business investment properties, including seniors housing facilities, in exchange for a percentage of the sale price.

135.     MARCUS & MILLICHAP, INC. conspired and endeavored with criminal intent to receive a portion of the proceeds of the unlawful operation of the Facilities, directly or indirectly, from a pattern of criminal activity to use or invest said proceeds in the operation of its real estate brokerage services enterprise in violation of § 772.103(4), Fla. Stat., as outlined below.

33

136.    MARCUS & MILLICHAP, INC. conspired with criminal intent to receive a portion of the proceeds of the unlawful operation of the Facilities, directly or indirectly, through a pattern of criminal activity including: (1) knowingly falsely representing orally, in writing, in print, or electronically that each of the Facilities were and are validly licensed, with the intent to sell the Facilities and the Facilities' assets, in violation of §817.41, Fla. Stat.; (2) falsely advertising that the licensees of the Facilities owned and could sell valid skilled nursing facility licenses, which licenses MARCUS & MILLICHAP, INC. offered for sale by placing advertisements before the general public, including the Brochure, with the intent not to sell valid licenses, in violation of §817.44, Fla. Stat.; (3) knowingly falsely advertising the Facilities as "premium assets" with the intent to sell said assets, in violation of §817.41, Fla. Stat.; (4) knowingly falsely representing orally, in writing, in print, or electronically that it would perform "detailed due diligence and financial analysis" on each facility, with the intent to sell the Facilities without ever performing such due diligence, in violation of §817.41, Fla. Stat.; (5) knowingly endeavoring to obtain portions of the proceeds of the unlawful operation of the Facilities, which proceeds were and are the legal property of the Plaintiffs and the Class members, to either temporarily or permanently deprive the Plaintiff and the Class members of their rights to, and benefits from, said proceeds, in violation of §812.014, Fla. Stat.

137.    These related activities were engaged in, and are still being engaged in, by MARCUS & MILLICHAP, INC. with the intent to conceal the schemes and the conspiracy perpetrated by it and the common enterprise, to induce possible good faith purchasers for value to purchase the Facilities, and to deprive Plaintiffs of any remedies, including their rights to restitution.

138.     The actions of MARCUS & MILLICHAP, INC. were not isolated, but were part of a continuous and ongoing pattern of criminal activity with such acts consisting of numerous predicate acts occurring on a regular basis from at least the date of the Brochure through the date of this complaint, with each such act constituting a separate and distinct act of false advertising, misleading advertising, and theft.

139.     MARCUS & MILLICHAP, INC. is jointly and severally liable for the acts of the common enterprise including the Management Companies, the Landowner Entities, Eliezer Scheiner, Teddy Lichtschein, MICHAEL BOKOR, and the purported licensees of the Facilities.

140.     At all relevant times, MARCUS & MILLICHAP, INC. knew or should have known that its actions described in this count would directly and proximately harm the Plaintiffs and the Class members.

141.     As a direct and proximate result of MARCUS & MILLICHAP, INC.'s violations of § 772.103(4), Fla. Stat., Plaintiffs and the Class members suffered damages.

WHEREFORE, Plaintiffs and the Class members demand judgment against MARCUS & MILLICHAP, INC. for treble damages, costs, expenses, and reasonable attorneys' fees, and all other amounts to which Plaintiffs and the Class members may be entitled.

### Count V
### Civil Remedies for Criminal Practices
### MICHAEL BOKOR

142.     Plaintiffs re-allege paragraphs 1 through 105 above, as if fully set forth herein.

143.     MICHAEL BOKOR maintained, directly or indirectly, his respective interest in the common enterprise detailed herein by agreeing to engage in a pattern of criminal activity in violation of § 772.103(2), Fla. Stat., as outlined below.

35

144.    MICHAEL BOKOR's pattern of criminal activity included, but was not limited to: (1) Knowingly filing materially false state license applications to the AHCA for the renewal of the license to operate Woodbridge Care Center on or about 2009, with the intent to mislead the officials at the AHCA in the performance of their official duties, in violation of §837.06, Fla. Stat.; (2) Knowingly filing materially false state license applications to the AHCA for the renewal of the license to operate Woodbridge Care Center on or about 2011, with the intent to mislead the officials at the AHCA in the performance of their official duties, in violation of §837.06, Fla. Stat.; (3) Knowingly filing materially false state license applications to the AHCA for the renewal of the license to operate Woodbridge Care Center on or about 2013, with the intent to mislead the officials at the AHCA in the performance of their official duties, in violation of §837.06, Fla. Stat.; (4) Knowingly filing materially false state license applications to the AHCA for the renewal of the license to operate Woodbridge Care Center on or about 2015, with the intent to mislead the officials at the AHCA in the performance of their official duties, in violation of §837.06, Fla. Stat.; (5) Knowingly filing thousands of false claims to Medicare and Medicaid for the provision of unlicensed nursing home services provided at the Facilities throughout the State of Florida, in violation of §414.39, Fla. Stat.;

145.    Additionally, MICHAEL BOKOR conspired to maintain his respective interest in the common enterprise detailed herein by agreeing to engage in a pattern of criminal activity in violation of § 772.103(4), Fla. Stat., as outlined below.

146.    MICHAEL BOKOR's pattern of criminal activity included, but was not limited to: (1) Knowingly filing materially false state license applications to the AHCA for the renewal of the license to operate Woodbridge Care Center on or about 2009, with the intent to mislead the officials at the AHCA in the performance of their official duties, in violation of §837.06, Fla.

36

Stat.; (2) Knowingly filing materially false state license applications to the AHCA for the renewal of the license to operate Woodbridge Care Center on or about 2011, with the intent to mislead the officials at the AHCA in the performance of their official duties, in violation of §837.06, Fla. Stat.; (3) Knowingly filing materially false state license applications to the AHCA for the renewal of the license to operate Woodbridge Care Center on or about 2013, with the intent to mislead the officials at the AHCA in the performance of their official duties, in violation of §837.06, Fla. Stat.; (4) Knowingly filing materially false state license applications to the AHCA for the renewal of the license to operate Woodbridge Care Center on or about 2015, with the intent to mislead the officials at the AHCA in the performance of their official duties, in violation of §837.06, Fla. Stat.; (5) Knowingly filing thousands of false claims to Medicare and Medicaid for the provision of unlicensed nursing and assisted living services provided at the Facilities throughout the State of Florida, in violation of §414.39, Fla. Stat.;

147.     These related activities were engaged in, and are still being engaged in, by MICHAEL BOKOR with the intent to continue and conceal the schemes and the conspiracy perpetrated by him and the common enterprise, to induce possible good faith purchasers for value to purchase the Facilities, and to deprive Plaintiffs of any remedies, including their rights to restitution.

148.     The actions of MICHAEL BOKOR were not isolated, but were part of a continuous and ongoing pattern of criminal activity with such acts consisting of numerous predicate acts occurring on a regular basis from at least 2009 through the date of this complaint, with each such act constituting a separate and distinct act of perjury and public assistance fraud.

149.     MICHAEL BOKOR is jointly and severally liable for the acts of the common enterprise including the Management Companies, the Landowner Entities, Eliezer Scheiner,

Teddy Lichtschein, MARCUS & MILLICHAP, INC., and the purported licensees of the Facilities.

150.    At all relevant times, MICHAEL BOKOR knew or should have known that his actions described in this count would directly and proximately harm the Plaintiffs and the Class members.

151.    As a direct and proximate result of MICHAEL BOKOR's violations of §§ 772.103(2) and (4), Fla. Stat., Plaintiffs and the Class members suffered damages.

WHEREFORE, Plaintiffs and the Class members demand judgment against MICHAEL BOKOR for treble damages, costs, expenses, and reasonable attorneys' fees, and all other amounts to which Plaintiffs and the Class members may be entitled.

### Jury Demand

Plaintiffs and the Class members demand a trial by jury of all matters so triable.

Dated: January 5, 2018

/s/ James L. Wilkes, II
James L. Wilkes, II, Esquire
Florida Bar #. 405337
WILKES & MCHUGH, P.A.
One N. Dale Mabry Hwy, Ste. 800
Tampa, FL  33609
Telephone: 813-873-0026
Facsimile: 813-286-8820
Primary: jimw@wilkesmchugh.com
Secondary: dthomason@wilkesmchugh.com
Tertiary: FL@wilkesmchugh.com
*Attorney for Plaintiffs*

38

# Exhibit "A"

IN THE CIRCUIT COURT FOR HILLSBOROUGH COUNTY,
FLORIDA                                PROBATE DIVISION

IN RE:  ESTATE OF

                               File No.    17-CP-001910

SHIRLEY TEMPLE COX

                               Division

Deceased.


LETTERS OF ADMINISTRATION
(single personal representative)

TO ALL WHOM IT MAY CONCERN:

WHEREAS, SHIRLEY TEMPLE COX, a resident of Hillsborough County, Florida, died on January 8, 2017, owning assets in the State of Florida, and

WHEREAS, BETTY MARIE SMITH has been appointed Personal Representative of the estate of the decedent and has performed all acts prerequisite to issuance of Letters of Administration in the estate,

NOW, THEREFORE, I, the undersigned Circuit Judge, declare BETTY MARIE SMITH duly qualified under the laws of the State of Florida to act as Personal Representative of the estate of SHIRLEY TEMPLE COX, deceased, with full power to administer the estate according to law; to ask, demand, sue for, recover and receive the property of the decedent; to pay the debts of the decedent as far as the assets of the estate will permit and the law directs; and to make distribution of the estate according to law.

Any settlement entered into by the Personal Representative must be approved by this Court if (1) there is an objection by any survivor to the amount or apportionment of the settlement, (2) the settlement affects a survivor who is a minor or incompetent, or (3) there will be any unsatisfied, valid creditor claims.  A copy of these Letters shall be filed in the wrongful death proceeding.

Ordered on _____, 2017.

                               Electronically Conformed 7/19/2017
                               _____
                               Circuit Judge

# Exhibit "B"

# DURABLE POWER OF ATTORNEY

Containing Health Care Surrogate & Pre-Need Guardian Provisions, and
Provisions Relating to Transfer of Real Property Including Homestead Property
(per §709.08 as amended)

BY THIS DURABLE POWER OF ATTORNEY, I, JOHN E. BALLEW, of
Lake County, Florida, appoint as my attorney-in-fact to manage my affairs as
indicated below my wife, JUDITH A. BALLEW.   Upon the death, failure or
inability of JUDITH A. BALLEW to act as my attorney-in-fact, then I appoint
SCOTT E. BALLEW, to act as Donee of this Power.

This durable power of attorney is not affected by my subsequent incapacity
except as provided in Chapter 709 of the Florida Statutes and is exercisable
from the date of execution.

1. <u>GENERAL GRANT OF POWER</u>:  I hereby grant to my agent full power and authority to exercise or
perform any act, power, duty, right or obligation whatsoever that I now have or may hereafter acquire, relating to any
person, matter, transaction, or any interest in property owned by me, including, without limitation, my interest in all
real property, including homestead real property; all personal property, tangible or intangible; all property held in
any type of joint tenancy, including a tenancy in common, joint tenancy with right of survivorship, or a tenancy by
the entirety; all property over which I hold a general, limited, or special power of appointment; choses in action, and
all other contractual or statutory rights or elections, including, but not limited to, any rights or elections in any
probate or similar proceeding to which I am or may become entitled; all as to such property now owned or hereafter
acquired by me. I grant to my agent full power and authority to do everything necessary in exercising any of the
powers herein granted as fully as I might or could do if personally present, with full power of substitution or
revocation. Except as otherwise limited by applicable law, or by this durable power of attorney, my attorney-in-fact
has full authority to perform without prior court approval, every act authorized and specifically enumerated in this
durable power of attorney. I hereby ratify and confirm that my Agent shall lawfully have, by virtue of this durable
power of attorney, the powers herein granted, including, but not limited to, the following:

a. My attorney-in-fact herein named and his/her successor(s) are all granted full power and authority to
collect all sums of money and other property that may be payable or belonging to me,
and to execute receipts, releases, cancellations or discharges.

b. My attorney-in-fact herein named and his/her successor(s) are all granted full power and authority to
settle any account in which I have any interest and to pay or receive the balance of that account as the case may
require.

c. My attorney-in-fact herein named and his/her successor(s) are all granted full power and authority to
borrow money on such terms and with such security as my attorney-in-fact may think fit and to execute all notes,
mortgages and other instruments that my attorney-in-fact finds necessary or desirable.

d. <u>Financial Institutions</u>:
My attorney-in-fact herein named and his/her successor(s) are all granted full power and authority to:
    (1) Conduct banking transactions as provided in Florida Statute § 709.2208(1);
    (2) Conduct investment transactions as provided in Section 709.2208(2), Florida Statutes;
    (3) Draw, accept, endorse or otherwise deal with any checks or other commercial or mercantile
instruments for my benefit, specifically including the right to make withdrawals from any savings account or savings
and loan deposits;



    (4) Adding or removing names to or from an existing account, whether as a co-owner, signer or
beneficiary, which power granted may be exercised by any person I have designated herein to serve
as my attorney-in-fact, it being my specific intent that the exercise of this power shall not be limited
to those persons who are my ancestor, spouse, or descendant;
    (5) Make deposits on my behalf;
    (6) Close any account held in my name;
    (7) Receive and endorse for deposit in any account any payment that I receive from any branch or
department of the United States or other government, including, without limitation, Social Security payments,
Veteran's Administrations payments or grants, Medicare or Medicaid payments.

e. My attorney-in-fact herein named and his/her successor(s) are all granted full power and authority to

LAW OFFICE OF EDWARD MANN — 27405 U.S. Hwy 27 - Ste 113, Leesburg, Florida 34748 — (352)314-2500

redeem bonds issued by the United States government or any of its agencies, any other bonds and any certificates of deposit or other similar assets belonging to me.

    f.  My attorney-in-fact herein named and his/her successor(s) are all granted full power and authority to sell bonds, shares of stock, warrants, debentures, or other assets belonging to me, and execute all assignments and other instruments necessary or proper for transferring them to the purchaser or purchasers, and give good receipts and discharges for all money payable in respect to them. Also, to execute stock powers or similar documents on my behalf and delegate to a transfer agent or similar person the authority to register any stocks, bonds, or other securities either into or out of my name or nominee's name.

    g.  My attorney-in-fact herein named and his/her successor(s) are all granted full power and authority to sell, rent, lease for any term, mortgage or exchange any real estate or interests in it, including homestead property, for such considerations and upon such terms and conditions as my attorney-in-fact may see fit, and execute, acknowledge and deliver all instruments conveying or encumbering title to property owned by me alone as well as any owned by me and by any other person, jointly. If I am married, the attorney-in-fact may not mortgage or convey my homestead property without joinder of my spouse or my spouse's legal guardian. Joinder by my spouse may be accomplished by the exercise of authority in a durable power of attorney executed by my joining spouse, and either my spouse or I may appoint the other as attorney-in-fact.  To contract with any person for leasing all or any real estate for such periods, at such rents and subject to such conditions as my attorney-in-fact shall deem advisable, to let any such person into possession thereto, to execute all such leases and contracts as shall be necessary or proper, to give notice of eviction to any tenant or occupant thereof, to receive and recover from all or any number of the tenants and occupants thereof all rents and sums of money which now are or shall hereafter become due and payable in respect thereof, and on nonpayment of any part or all thereof, to take all necessary or proper means and proceedings for terminating the tenancy or occupancy of such tenants or occupants and for evicting tenants or occupants and recovering the possession thereof.


    (1)  My attorney-in-fact herein named and his/her successor(s) are all granted full power and authority to execute, acknowledge and deliver all instruments conveying or encumbering title to the remainder interest in property owned by me alone as well as any owned by me and by any other person, jointly, to any person, including the attorney-in-fact or any individual to whom the attorney-in-fact owes an obligation of support, by use of an "Enhanced Life Estate" or "Ladybird" Deed.  This power granted may be exercised by any person I have designated herein to serve as my attorney-in-fact, it being my specific intent that the exercise of this power shall not be limited to those persons who are my ancestor, spouse, or descendant.


    (2)  <u>Specific Real Estate Powers Regarding Homestead</u>:  The attorney-in-fact herein named and his/her successor(s) are all granted the authority to sell, to convey, to maintain, to mortgage or to dispose of, the following described property, and to execute any and all documents necessary to effectuate the sale and/or conveyance, and to encumber, and to dispose of, the following described real property, to wit: **Lot 57, The Plantation at Leesburg, River Crest Unit 1, according to the plat thereof as recorded in Plat Book 37, Pages 37, 38 and 39, Public Records of Lake County, Florida;** and such documents shall include, but not be limited to, contracts, deeds, affidavits, bills of sale, closing statements, mortgages notes and such other instruments as may be required to carry out the purposes herein expressed, and I, JOHN E. BALLEW, hereby give and grant unto the attorney-in-fact named herein and his/her successors, said attorney-in-fact, full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises as fully, to all intents and purposes, as I, JOHN E. BALLEW might or could do if personally present, with full power of substitution and revocation, hereby ratifying and confirming all that said attorney-in-fact or his/her successors, shall lawfully do or cause to be done by virtue hereof.  This power granted may be exercised by any person I have designated herein to serve as my attorney-in-fact, it being my specific intent that the exercise of this power shall not be limited to those persons who are my ancestor, spouse, or descendant.


    h.  My attorney-in-fact herein named and his/her successor(s) are all granted full power and authority to create, amend, or modify any Inter Vivos Trust in my name, including the power to name or change beneficiaries, to do and perform all and every act and thing relating to the creation, amendment, or modification of any Revocable Living Trust.  The beneficiaries of any Trust created hereunder may be any person, including the attorney-in-fact or any individual to whom the attorney-in-fact owes an obligation of support.  My attorney-in-fact herein named and his/her successor(s) may deliver, convey and/or transfer any or all of my assets to the Trustee or Trustees of any trust created by me or created by my Attorney-in-fact for my benefit.  This power granted may be exercised by any person I have designated herein to serve as my attorney-in-fact, it being my specific intent that the exercise of this power shall not be limited to those persons who are my ancestor, spouse, or descendant.

i. If my attorney-in-fact herein named or his/her successor(s) is also named as a Trustee, Co-Trustee, Successor Trustee or Successor Co-Trustee under any Trust created by me, then my attorney-in-fact may also exercise all the Trustee powers granted to me under the terms of that Trust, including, but not limited to, the power to sell, convey, mortgage, lease or otherwise dispose of any real property, or interest in real property, held by that Trust.

j. My attorney-in-fact herein named and his/her successor(s) are all granted full power and authority to execute any documents on my behalf for the purpose of qualifying for any public or private benefits, including, but not limited to, applying for Medicaid or other public or private benefits.

 (1) If my income exceeds any income limit imposed by any such benefit program, my attorney-in-fact herein named and his/her successor(s) are all granted full power and authority to create an irrevocable income trust and to transfer so much of my income to said trust as will enable me to qualify for the Medicaid or other benefits. This power granted may be exercised by any person I have designated herein to serve as my attorney-in-fact, it being my specific intent that the exercise of this power shall not be limited to those persons who are my ancestor, spouse, or descendant.

k. My attorney-in-fact herein named and his/her successor(s) are all granted full power and authority to handle my Medicare affairs, if I am a Medicare Patient. Medicare administrators are authorized to release to my attorney-in-fact, Medicare information, even that information covered by the Privacy Act.

l. My attorney-in-fact herein named and his/her successor(s) are all granted full power and authority to represent me before the Treasury Department in connection with any matter involving any federal taxes in which I am a party, to prepare, sign, execute, verify and file any Federal, State, County and Municipal income, gift, property, estate and/or any other (for all periods, whether before or after the execution of this instrument) return required to be made under the revenue laws of the United States, or the Internal Revenue Code, or under the statutes of any state and to file any claim for refund, offer and compromise or application for a closing agreement, receive and endorse refund checks, execute waivers of any period of limitation, request extensions of time, execute any waiver of restrictions on assessment for collection of any tax, to execute consents extending the statutory period of assessments or collections of taxes, to receive confidential information regarding tax matters, to execute a closing agreement (under Internal Revenue Code Section 7121, or its successor provisions) in respect to any tax liability or specific matter, to execute a protest to a determination of taxes, to delegate authority or to substitute another attorney or agent and to execute Petition of Appeal to the United States Tax Court.

 m. My attorney-in-fact herein named and his/her successor(s) are all granted full power and authority to create, amend, or modify any Individual Retirement Account (IRA) in my name, including the power to change beneficiaries, to begin or increase withdrawals and to do and perform all and every act and thing relating to the management of any Individual Retirement Account. The beneficiaries of any said IRA created, amended or modified hereunder may be any person, including the attorney-in-fact or any individual to whom the attorney-in-fact owes an obligation of support. This power granted may be exercised by any person I have designated herein to serve as my attorney-in-fact, it being my specific intent that the exercise of this power shall not be limited to those persons who are my ancestor, spouse, or descendant.

n. My attorney-in-fact herein named and his/her successor(s) are all granted full power and authority, in connection with any pension, profit sharing or stock bonus plan, individual retirement arrangement, § 403(b) annuity or account, § 457 plan or any other retirement plan, arrangement or annuity in which I am a participant or of which I am a beneficiary (whether established by my attorney-in-fact or otherwise), (each of which is hereinafter referred to as "such Plan"):

(1) To make contributions (including "rollover" contributions) or cause contributions to be made to such Plan with my funds or otherwise on my behalf.

(2) To receive and endorse checks or other distributions to me from such Plan, or to arrange for the direct deposit of same in any account in my name or in the name of any revocable "living" trust established by me.

(3) To elect a form of payment of benefits from such Plan, to withdraw benefits from such Plan, to make contributions to such Plan, and to make, exercise, waive or consent to any and all elections and/or options that I may have regarding the contributions to, investments or administration, of, or distribution or form of benefits under, such Plan.

 (4) To designate one or more beneficiaries or contingent beneficiaries for any benefits payable under such Plan on account of my death, and to change any such prior designation of beneficiary made by me or by my attorney-in-fact; provided, however, that my attorney-in-fact shall have no power to designate my attorney-in fact directly or indirectly as a beneficiary or contingent beneficiary to receive a greater share or proportion of any such benefits than my attorney-in fact would have otherwise received unless such change is consented to by all other beneficiaries who would have received the

benefits but for the proposed change. This limitation shall not apply to any designation of my attorney-in-fact as a beneficiary in a fiduciary capacity, with no beneficial interest. This power granted may be exercised by any person I have designated herein to serve as my attorney-in-fact, it being my specific intent that the exercise of this power shall not be limited to those persons who are my ancestor, spouse, or descendant.

    o. My attorney-in-fact herein named and his/her successor(s) are all granted full power and authority to create, amend, or modify any Life Insurance Policy in my name, including:



    (1) The power to change beneficiaries. The beneficiaries so designated may include, but are not limited to, may be any person, including the attorney-in-fact or any individual to whom the attorney-in-fact owes an obligation of support. This power granted may be exercised by any person I have designated herein to serve as my attorney-in-fact, it being my specific intent that the exercise of this power shall not be limited to those persons who are my ancestor, spouse, or descendant.

    (2) To begin or increase withdrawals.

    (3) To authorize and receive a distribution of cash value.

    (4) To do and perform all and every act and thing relating to the management of any Life Insurance Policy.

    p. My attorney-in-fact herein named and his/her successor(s) are all granted full power and authority to access, withdraw from or place articles into any safety deposit box held in my name at any banking, financial or other institution holding such safety deposit box.



    q. My attorney-in-fact herein named and his/her successor(s) are all granted full power and authority to claim, disclaim, or waive any interest in property that I have or would otherwise receive, including, but not limited to any homestead property and any elective share property. This power granted may be exercised by any person I have designated herein to serve as my attorney-in-fact, it being my specific intent that the exercise of this power shall not be limited to those persons who are my ancestor, spouse, or descendant.



    r. My attorney-in-fact herein named and his/her successor(s) are all granted full power and authority to make gifts from any and all of my assets, to any individual or institution, including the attorney-in-fact or any individual to whom the attorney-in-fact owes an obligation of support. This power granted may be exercised by any person I have designated herein to serve as my attorney-in-fact, it being my specific intent that the exercise of this power shall not be limited to those persons who are my ancestor, spouse, or descendant. Except for gifts made to my spouse, if any, the amount given to any donee shall not exceed the annual dollar limits of the federal gift tax exclusion under 26 U.S.C. § 2503(b).

    s. HIPAA Release/Access to Protected Health Information (PHI) under HIPAA: I authorize my attorney-in-fact herein named and his/her successor(s) to:



    (1) Receive any of my health information, whether oral or recorded in any form or medium, that:

    (a) Is created or received by a health care provider, health care facility, health plan, public health authority, employer, life insurer, school or university, or health care clearinghouse; and

    (b) Relates to my past, present, or future physical or mental health or condition; the provision of health care to me; or the past, present, or future payment for the provision of health care to me.

    (2) Be my "personal representative" as defined in HIPAA regulations, and as such is authorized to receive and authorize transmission of any Protected Health Information (PHI) as defined under HIPAA. This PHI, to which my personal representative shall have access, shall include, but not be limited to, my entire medical record or complete medical file, wherever held, including, but not limited to, those records held by any health plan, physician, health care professional, hospital, clinic, laboratory, pharmacy, medical facility, or other health care provider or other medical source that has provided payment, treatment, or services to me or on my behalf. My Health Care Surrogate may authorize the release of any information or clinical records, whether protected under HIPAA or not, to appropriate persons to ensure the continuity of my health care.

    (3) My attorney-in-fact and any successor(s) are all granted full power and authority to demand, obtain, review and release to others my medical records or other documents protected by the patient-physician privilege, attorney-client privilege or any similar privilege; to file or process claims for any medical bills with all insurances companies through which I have coverage, including, but not limited to Medicare and Medicaid; to receive from Blue Cross/Blue Shield or any other insurer, information obtained in adjudication of any claim in regard to services furnished to me under Title 18 of the Social Security Act.

    t. The above powers conferred upon my attorney-in-fact extend to all of my right, title and interest in such property as I have described above, whether real or personal, tangible or intangible, and in which I may have an interest jointly with any other person, whether in an estate by the entirety, joint tenancy or tenancy in common.

    u. The attorney-in-fact herein named and his/her successor(s) are all designated by me as a "legally

authorized person" as defined in Florida Statute § 497.005(1) and have the authority to determine the disposition of my remains upon my death. This authority is specifically intended to include, but not be limited to, the authority contemplated in Florida Statute § 497.607(1) to authorize cremation of my remains.

2. HEALTH CARE SURROGATE PROVISIONS (Designation of Health Care Surrogate Pursuant to F.S. §§709.08 and 765):

    a. I designate as my surrogate for health care decisions, JUDITH A. BALLEW, telephone number: _____. In the event that JUDITH A. BALLEW is or becomes unwilling or unable to perform her duties, I wish to designate as my surrogate, SCOTT E. BALLEW, telephone number: _____. This designation revokes any prior health care surrogate designation which I may have made.

    b. I authorize my health care surrogate to:



Receive any of my health information, whether oral or recorded in any form or medium, that:
(1) Is created or received by a health care provider, health care facility, health plan, public health authority, employer, life insurer, school or university, or health care clearinghouse; and
(2) Relates to my past, present, or future physical or mental health or condition; the provision of health care to me; or the past, present, or future payment for the provision of health care to me.

(3) Access to Protected Health Information (PHI) under HIPAA: My Health Care Surrogate is designated as my "personal representative" as defined in HIPAA regulations, and is authorized to receive and authorize transmission of any Protected Health Information (PHI) as defined under HIPAA. This PHI, to which my personal representative shall have access, shall include, but not be limited to, my entire medical record or complete medical file, wherever held, including, but not limited to, those records held by any health plan, physician, health care professional, hospital, clinic, laboratory, pharmacy, medical facility, or other health care provider or other medical source that has provided payment, treatment, or services to me or on my behalf. My Health Care Surrogate may authorize the release of any information or clinical records, whether protected under HIPAA or not, to appropriate persons to ensure the continuity of my health care.



c. I further authorize my health care surrogate to make all health care decisions for me, which means he or she has the authority to:
(1) Provide informed consent, refuse or withdraw consent to any and all types of medical care, treatment, surgical procedures, diagnostic procedures, medication, and the use of mechanical or other procedures that affect any bodily function, including, but not limited to, artificial respiration, nutritional support and hydration, and cardiopulmonary resuscitation, including life-prolonging or death-delaying procedures.
(2) Apply on my behalf for private, public, government, or veterans' benefits to defray the cost of health care and to have access to information regarding my income and assets to the extent required to make application.
(3) Access my health information reasonably necessary for the health care surrogate to make decisions involving my health care and to apply for benefits for me.
(4) Decide to make an anatomical gift pursuant to part V of chapter 765, Florida Statutes.
(5) Additional Instructions: Without limitation on the rights and authority of my Surrogate, my Surrogate may, among other acts and decisions:
(a) Have final authority to act for me and to make health care decisions for me in matters regarding my health care;
(b) Consult with appropriate health care providers to provide informed consent in my best interests as the Surrogate perceives same;
(c) Give any consent in writing using the appropriate consent forms;
(d) Authorize the transfer and admission of me to or from a health care facility;
(e) To authorize my discharge, even against medical advice, from any hospital, nursing home, residential care, assisted living or similar facility or service;
(f) Seek Court orders providing for the withholding and withdrawal of life-prolonging or death-delaying procedures; and
(g) Do all acts and make all decisions regarding my health care as authorized by law.

    d. While I have decision-making capacity, my wishes are controlling and my physicians and health care providers must clearly communicate to me the treatment plan or any change to the treatment plan prior to its implementation.

    e. To the extent I am capable of understanding, my health care surrogate shall keep me reasonably informed of all decisions that he or she has made on my behalf and matters concerning me.

    f. This Health Care Surrogate designation is not affected by my subsequent incapacity except as provided

LAW OFFICE OF EDWARD MANN — 27405 U.S. Hwy 27 - Ste 113, Leesburg, Florida 34748 — (352)314-2500

5

in Chapter 765, Florida Statutes.

 g. Pursuant to Florida Statute § 765.104, I understand that I may, at any time while I retain my capacity, revoke or amend this designation by:

  (1) Signing a written and dated instrument which expresses my intent to amend or revoke this designation;

  (2) Physically destroying this designation through my own action or by that of another person in my presence and under my direction;

  (3) Verbally expressing my intention to amend or revoke this designation; or

  (4) Signing a new designation that is materially different from this designation.

 h. My Health Care Surrogate's authority becomes effective when (1) my primary physician determines that I am unable to make my own health care decisions, pursuant to the standards set forth in Florida Statute § 765.204, or (2) I have been determined to be incapacitated by a court of competent jurisdiction, unless I initial either or both of the following boxes:

 If I initialed this box, my Health Care Surrogate's authority to receive my health information takes place immediately.

 If I initialed this box, my Health Care Surrogate's authority to make health care decisions for me takes effect immediately. Pursuant to Florida Statute § 765.204(3), any instructions or health care decisions I make, either verbally or in writing, while I possess capacity, shall supercede any instructions or health care decisions made by my surrogate that are in material conflict with those made by me.

 i. My Surrogate shall not be liable or responsible for any costs or expenses of my medical treatment or care except as expressly stated by Statute and my Surrogate's signature on any admission papers for a health care facility shall not make the Surrogate liable or responsible for any costs and expenses incurred for my care at such health care facility, it being understood that the Surrogate acts for me and in my stead, and I, alone, would be liable or responsible for such costs and expenses.

 j. I further affirm that this designation is not being made as a condition of treatment or admission to a health care facility.

 k. I hereby declare that the health care surrogate herein named and his/her successor(s) are designated by me as a "legally authorized person" as defined in Florida Statute § 497.005(39) and have the authority to determine the disposition of my remains upon my death. This authority is specifically intended to include, but not be limited to, the authority contemplated in Florida Statute § 497.607(1) to authorize cremation of my remains.

 3. <u>STANDARD OF CARE</u>: Except as otherwise provided herein, any attorney-in-fact named herein is a fiduciary who must observe the standards of care applicable to trustees as described in Chapter 709 of the Florida Statutes. My attorney-in-fact is not liable to third parties for any act pursuant to this durable power of attorney if the act was authorized at the time. If the exercise of the power is improper, my attorney-in-fact is liable to interested persons as described in Florida Statute § 731.201 for damage or loss resulting from a breach of fiduciary duty by my attorney-in-fact to the same extent as the trustee of an express trust. If my attorney-in-fact has accepted appointment either expressly in writing or by acting under the power, my attorney-in-fact is not excused from liability for failure either to participate in the administration of assets subject to the power or for failure to attempt to prevent a breach of fiduciary obligations thereunder.

 4. <u>MULTIPLE ATTORNEYS-IN-FACT: WHEN JOINT ACTION REQUIRED</u>: Unless my durable power of attorney provides otherwise;

  a. If my durable power of attorney is vested jointly in two attorneys-in-fact by the same instrument, concurrence of both is required on all acts in the exercise of the power.

  b. If my durable power of attorney is vested jointly in three or more attorneys-in-fact by the same instrument, concurrence of a majority is required in all acts in the exercise of the power.

  c. Any attorney-in-fact who has not concurred in the exercise of authority is not liable to me or any other person for the consequences of the exercise. A dissenting attorney-in-fact is not liable for the consequences of an act in which the attorney-in-fact joins at the direction of the majority of the joint attorneys-in-fact if the attorney-in-fact expresses such dissent in writing to any of the other joint attorneys-in-fact at or before the time of the joinder.

  d. Unless my durable power of attorney provides otherwise, all authority vested in multiple attorneys-in-fact may be exercised by the one or more that remain after the death, resignation, or incapacity of one or more of the multiple attorneys-in-fact.

5. <u>INTERPRETATION AND GOVERNING LAW</u>: This instrument is executed by me in the State of Florida, but it is my intention that this power of attorney shall be exercisable in any other state or jurisdiction where I may have any property or interests in property. This instrument is to be construed and interpreted as a durable power of attorney as provided for in Chapter 709 of the Florida Statutes, and as a health care surrogate as provided for in Florida Statute Chapter 765, as these statutes may be amended from time to time. The enumeration of specific powers herein is not intended to, nor does it, limit or restrict the general powers herein granted to my Agent. This instrument is executed and delivered in the State of Florida, and the laws of the State of Florida shall govern all questions as to the validity of this power and the construction of its provisions.

6. <u>THIRD PARTY RELIANCE</u>:

    a. Any third party may rely upon the authority granted in my durable power of attorney until the third party has received notice as provided herein.

    b. Until a third party has received notice of revocation pursuant to the terms contained herein, partial or complete termination of the durable power of attorney by adjudication of incapacity, suspension by initiation of proceedings to determine incapacity, my death, or the occurrence of an event referenced in this durable power of attorney, the third party may act in reliance upon the authority granted in this durable power of attorney.

    c. A third party that has not received written notice hereunder may, but need not, require that my attorney-in-fact execute an affidavit stating that there has been no revocation, partial or complete termination, or suspension of the durable power of attorney at the time the power of attorney is exercised. A written affidavit executed by my attorney-in-fact under this paragraph is attached.

    d. Third parties who act in reliance upon the authority granted to my attorney-in-fact hereunder and in accordance with the instructions of the attorney-in-fact will be held harmless by me from any loss suffered or liability incurred as a result of actions taken prior to receipt of written notice of revocation, suspension, notice of a petition to determine incapacity, partial or complete termination, or my death. A person who acts in good faith upon any representation, direction, decision, or act of my attorney-in-fact is not liable to me or to my estate, beneficiaries, or joint owners for those acts.

    e. My attorney-in-fact is not liable for any acts or decisions made by him or her in good faith and under the terms of the durable power of attorney.

7. <u>NOTICE</u>:

    a. A notice, including, but not limited to, a notice of revocation, partial or complete termination, suspension, or otherwise, is not effective until written notice is served upon my attorney-in-fact or any third persons relying upon this durable power of attorney.

    b. Notice must be in writing and served on the person or entity to be bound by such notice. Service may be by any form of mail that requires a signed receipt or by personal delivery as provided in the Florida Statutes for service of process, and must otherwise be in accordance with Chapter 709 of the Florida Statutes.

    c. Any act that is done under this power between the revocation of this instrument and notice of that revocation to my attorney-in-fact shall be valid unless the person claiming the benefit of the act had notice of that revocation.

8. <u>VALIDITY</u>: This durable power of attorney shall be non-delegable, except as to the stock powers which may be delegated to a transfer agent per paragraph 1.f hereunder, and shall be valid until such time as I shall die, revoke the power, or shall be adjudged totally or partially incompetent by a court of competent jurisdiction. I may revoke the power only by providing written notice to my Agent. All acts of my Agent taken or done without actual knowledge of 1) my death, 2) an adjudication of my incompetency, or 3) my revocation are valid and effective, and are hereby ratified and confirmed.

9. <u>REVOCATION OF PRIOR INSTRUMENTS</u>: By this instrument I hereby revoke any power of attorney, durable or otherwise, that I may have executed prior to the date of this durable power of attorney. I hereby confirm all acts of my attorney-in-fact pursuant to this power.

10. <u>DECLARATION NAMING PRE-NEED GUARDIAN</u> (Designation of Preneed Guardian Pursuant to Florida Statute § 744.3045, as amended):

    a. If I am at any time determined to be an incapacitated person, as that term is defined in the Florida Guardianship Law, as it now exists or may be hereafter amended, I declare that my then serving attorney-in-fact is to serve as the plenary guardian of my property, to exercise all delegable legal rights and powers to perform all tasks

necessary to care for my property or estate.

b. I further declare that my then serving health care surrogate is also to serve as plenary guardian of my person, to exercise all delegable legal rights and powers to perform all tasks necessary to care for my person.

c. I further declare that it is my intent and desire that the above-named persons be appointed by the Court having jurisdiction to serve without bond.

IN WITNESS WHEREOF, I have hereunto set my hand and seal on this 5th day of November, 2015.

Signed, sealed and delivered
in the presence of:

EDWARD L. MANN, JR.

JOHN E. BALLEW

CARLOTTA FALAVINHA

STATE OF FLORIDA
COUNTY OF LAKE

BEFORE ME, the undersigned authority, duly authorized to take acknowledgments and administer oaths, personally appeared JOHN E. BALLEW to me personally known, and known to be the same person described in, who produced a Florida Driver's License as identification, and who executed the within Power of Attorney, and acknowledged the within Power of Attorney to be his act and deed.

SWORN TO BEFORE ME on this 5th day of November, 2015.

NOTARY PUBLIC

> CARLOTTA FALAVINHA
> Commission # FF 022136
> Expires May 29, 2017
> Bonded Thru Troy Fain Inc.   :a 800-385-7019

# Exhibit "C"

Filing # 52778500 E-Filed 02/21/2017 03:32:33 PM

IN THE CIRCUIT COURT FOR CITRUS COUNTY, FLORIDA
PROBATE DIVISION

IN RE: ESTATE OF

File No. 2017 CP 000105

ROGER J. LAPP

Division

Deceased.

## LETTERS OF ADMINISTRATION
### (single personal representative)

TO ALL WHOM IT MAY CONCERN:

WHEREAS, ROGER J. LAPP, a resident of Citrus County, Florida, died on August 19, 2016, owning assets in the State of Florida, and

WHEREAS, MARK F. LAPP, has been appointed Personal Representative of the estate of the decedent and has performed all acts prerequisite to issuance of Letters of Administration in the estate,

NOW, THEREFORE, I, the undersigned Circuit Judge, declare MARK F. LAPP, duly qualified under the laws of the State of Florida to act as Personal Representative of the estate of ROGER J. LAPP, deceased, with full power to administer the estate according to law; to ask, demand, sue for, recover and receive the property of the decedent; to pay the debts of the decedent as far as the assets of the estate will permit and the law directs; and to make distribution of the estate according to law.

Ordered on _____Mar 3_____, 2017.

_____
Circuit Judge

MAR 3 '17 11:44AM

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Order has been furnished by E-Service on ___Mar 6___, 201__ to:

Derek B. Alvarez, Esquire
GADeservice@GendersAlvarez.com
GENDERS ✦ ALVAREZ ✦ DIECIDUE, P.A.
2307 West Cleveland Street
Tampa, FL 33609

By: _____
Deputy Clerk/Judicial Assistant